**LEAGUE OF UNITED LATIN AMERICAN CITIZENS, Maria Olympia Hernandez, Reina Raquel Guillen, Blanca Lopez, Maria Garza and all other persons similarly situated, Plaintiffs,**

v.

**PASADENA INDEPENDENT SCHOOL DISTRICT, Defendant.**

Civ. A. No. H–87–935.

United States District Court, S.D. Texas, Houston Division.

April 14, 1987.

As Amended June 10, 1987.

---

**444**

Isaias D. Torres, Houston, Tex., for plaintiffs.

Kelly Frels, Merri Schneider-Vogel, Arturo G. Michel, Bracewell & Patterson, Houston, Tex., for defendant.

## MEMORANDUM AND ORDER

McDONALD, District Judge.

On November 6, 1986, the Immigration Reform and Control Act of 1986 ("IRCA") became law.[1] This legislation was designed, in part, to allow hundreds of thousands of undocumented aliens now present in the United States to become citizens by proceeding through a several-step legalization process. In enacting this law Congress recognized that:

> The United States has a large undocumented alien population living and working within its borders. Many of these people have been here for a number of years and have become a part of their communities. Many have strong family ties here which include U.S. citizens and lawful residents. They have built social networks in this country. They have contributed to the United States in myriad ways, including providing their talents, labor and tax dollars. However, because of their undocumented status, these people live in fear, afraid to seek help when their rights are violated, when they are victimized by criminals, employers or landlords or when they become ill.
>
> Continuing to ignore this situation is harmful to both the United States and the aliens themselves.

H.R.Conf.Rep. No. 99–682(I), at 49, U.S. Code Cong. & Admin. News 1986, pp. 5649, 5653.

Only those undocumented aliens who can demonstrate that they have lived in the United States since prior to January 1, 1982, are protected under the Act and are eligible for legalization. IRCA also makes it illegal to hire unauthorized aliens after November 6, 1986, and provides for sanc-

---

1. Pub. L. No. 99–603, 100 Stat. 3359 (1986). IRCA amends or creates new sections to the existing Immigration and Nationality Act, which is found at Title 8 of the United States Code.

The provisions of IRCA have yet to be codified. Consequently, the Court will refer to specific provisions of IRCA by the designation supplied as part of the Act.

tions against an employer to enforce this provision. The period between November 6, 1986, and June 1, 1987, is to be a public information period during which the employer sanction provisions will not be enforced. Individuals cannot apply for legalization until May 5, 1987.

The Act also contains provisions against discrimination based on national origin or citizenship status that might result from the new law. The instant action calls upon the Court to determine, among other things, whether Defendant's termination of Plaintiffs violated these anti-discrimination provisions.

On March 27, 1987, this Court conducted a hearing on Plaintiffs' Motion for a Preliminary Injunction filed pursuant to Federal Rule of Civil Procedure 65. At that time, the Court received documentary and testimonial evidence. Having considered the pleadings on file, the arguments of counsel and the evidence adduced at trial, the Court hereby grants Plaintiffs' Motion for Preliminary Injunction.

### Background

Plaintiff, League of United Latin American Citizens ("LULAC"), is a non-profit corporation organized under the laws of the state of Texas for benevolent, charitable, educational, and patriotic purposes. LULAC is the oldest national organization of persons of Hispanic descent in the United States and was founded for the express purpose of protecting, defending, and preserving the civil rights of Hispanics.

Plaintiffs Maria Olympia Hernandez, Reina Raquel Guillen, Blanca Lopez, and Maria Garza (the "individual Plaintiffs") are undocumented aliens, each of whom entered the United States before January 1, 1982. As undocumented aliens, the individual Plaintiffs are currently unable to obtain valid social security numbers.

The individual Plaintiffs were employed by the Pasadena Independent School District ("PISD") prior to November 6, 1986. At the time they applied for employment, each individual Plaintiff inserted an invalid social security number on her application form.

The individual Plaintiffs are eligible for the legalization program under Section 245A of IRCA. Each testified that she intends to submit an application for legalization once the program is initiated. Applications for this legalization program will not be accepted until May 5, 1987. The continued employment of the Plaintiffs is permitted under the Grandfather Clause of IRCA, Section 101(a)(3). Upon approval of their legalization applications, each individual Plaintiff will be authorized to secure a valid social security number.

On February 18, 1987, each of the individual Plaintiffs was terminated from her employment as a custodial worker by PISD on the ground that she had provided false information on the PISD employment application by giving an invalid social security number. The Defendant maintains a policy that falsifying information on an application constitutes grounds for refusal to hire or termination. (Defendant's Exhibit 1). This policy, although in operation when Plaintiffs applied for employment, was not stated on the application nor was it communicated to Plaintiffs by school district personnel.

As part of its stated hiring practices, PISD also declares that information contained in applications for non-contract employment "shall be verified" within a thirty-day probationary period. (Defendant's Exhibit 1). Contrary to this provision, Defendant failed to investigate the validity of social security numbers offered on Plaintiffs' applications. Plaintiffs had been assigned to the custodial staff of Defendant's Sam Rayburn High School. The Director of Operations, who is responsible for the custodial staff, testified that he would recommend rehiring the Plaintiffs notwithstanding their submission of false social security numbers if they secured valid numbers because they were "good people" who had performed their jobs satisfactorily, some for as long as seven years.

At no time during their stay in the United States have any of the Plaintiffs been arrested or convicted of a criminal offense. Of the approximately 321 employees in the

PISD Operations Department, 89.4% are Hispanic.

Beginning sometime in late January or early February 1987, officials at the high school distributed new W–4 employee withholding forms as authorized by the Internal Revenue Service. One worker, Francisco Hernandez, provided a social security number on the new form that was different from the one that he had previously provided. He admitted that he had used a false number and was terminated. On or about February 11, 1987, six Hispanic workers at Sam Rayburn High School, including the Plaintiffs, were confronted with the fact that they had supplied false social security numbers. There is controverted evidence as to how these six individuals were identified.[2] The PISD Personnel Department authorized school officials to give the workers five days to secure a valid number. (Defendant's Exhibits 2–5). Plaintiffs were told that if they complied then they could keep their jobs. Since the mechanism for qualified undocumented aliens to obtain valid social security numbers has yet to be established, Plaintiffs could not comply with Defendants directive and were discharged. (Defendant's Exhibits 6–9). None of the Plaintiffs have been able to find employment since leaving PISD.

### Jurisdiction, Venue, and Standing

Jurisdiction of this Court is conferred by 28 U.S.C. § 1331 (federal question); 8 U.S.C. § 1329 (actions arising under Title 8); and 28 U.S.C. § 1343 (civil rights). Declaratory and injunctive relief is authorized pursuant to 28 U.S.C. §§ 2201 and 2202. Venue is proper in this Court under 28 U.S.C. § 1391 since all parties reside in the Southern District of Texas.

IRCA authorizes administrative remedies for violations of certain provisions of the Act. Once created, administrative remedies must usually be exhausted before a district or appellate court will intervene.

This principle prevents premature interference with agency procedures and affords the courts with benefit of the agency's expertise and administrative record. *Weinberger v. Salfi*, 422 U.S. 749, 765, 95 S.Ct. 2457, 2467, 45 L.Ed.2d 522 (1975). The administrative structure established under IRCA, however, is not currently in place. The Court concludes that in the absence of such a structure, jurisdiction is proper in the district court pursuant to 8 U.S.C. § 1329.

LULAC District Eight acts herein by and through its president, Margaret Gonzales. The organization's membership includes persons who are threatened by Defendants actions, including some of the named Plaintiffs. LULAC has standing to assert the corresponding rights of its members and to be a party to this action. *NAACP v. Button*, 371 U.S. 415, 428, 83 S.Ct. 328, 335, 9 L.Ed.2d 405 (1963).

Plaintiffs seek to bring this suit as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure. No motion for class certification has been filed; such determination will be made at a later time. The Court notes, however, that Plaintiffs seek to enjoin enforcement of a school policy, and injunctive relief would, of course, apply to the potential members of the class.

### Preliminary Injunction

It is well settled that in order for the Court to issue a preliminary injunction, the Plaintiffs must establish:

(a) a substantial likelihood of prevailing on the merits.

(b) a substantial threat that irreparable injury will result in the absence of the injunction.

(c) that the threatened injury to the plaintiff outweighs the threatened harm to the defendant; and

---

**2.** There was much testimony regarding how the Defendant became aware of the false social security numbers. Plaintiffs contended that the discovery resulted from a "witch-hunt" whereby PISD sought out the named Plaintiffs. The PISD contended that the named Plaintiffs or at least some of them gave this information to PISD. Having received this information, PISD asserted that it had no alternative but to terminate the Plaintiffs in conformity with its employment policy.

(d) that granting the injunction will not disserve the public interest.

*Southerland v. Thigpen,* 784 F.2d 713, 715 (5th Cir.1986). The Court finds that Plaintiffs have established all four prerequisites for the issuance of a preliminary injunction.

Plaintiffs' Complaint alleges three causes of action against Defendant. First, it alleges that Defendant deprived named Plaintiffs of procedural due process and that dismissal of Plaintiffs was arbitrary, capricious and discriminatory in violation of 42 U.S.C. § 1983 and the Due Process Clause of the Fourteenth Amendment of the United States Constitution. Second, Plaintiffs assert that they were singled out for dismissal in violation of 42 U.S.C. §§ 1981, 1983 and the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. A violation of the anti-discrimination provision of Section 274B(a) of IRCA is the Plaintiffs' third cause of action. The Court concludes that at this time Plaintiffs have demonstrated a substantial likelihood of prevailing on the merits as to the third cause of action only.

Plaintiffs' entitlement to procedural due process in connection with their termination "depends on their having had a property right in continued employment." *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985). Plaintiffs have not substantiated their contention that they have a constitutionally protected property interest in employment. Plaintiffs did offer testimony from the principal of the high school that they were performing their jobs well and that if they continued to do so, Plaintiffs could expect to be employed for the forseeable future. However, there was no showing that the principal had the authority to make such an offer. Moreover, enforceability of that statement is somewhat doubtful having reviewed the testimony of the witnesses as a whole. The evidence suggested that Plaintiffs were non-contractual employees. As non-contractual employees, they have no property rights in continued employment. *See Sabine Pilot Service, Inc. v. Hauck,* 687 S.W.2d 733 (Tex.1985).

Defendant argues in the alternative that if procedural due process was required before dismissing the Plaintiffs, then it was afforded when Plaintiffs had an opportunity to seek redress at a school board meeting. No member of the PISD school board testified and none of the witnesses who testified made reference to the hearing. Consequently, the Court cannot ascertain whether such a meeting occurred or what may have transpired at that time.

In any event, without a recognized right in continued employment, it is unlikely that Plaintiffs will be able to substantiate their § 1983 claim, since such a claim requires deprivation of a federally guaranteed right.[3] Plaintiffs have failed to demonstrate a likelihood of success on the merits of this cause of action.

Plaintiffs have also been unable at this stage of the proceedings to substantiate their Equal Protection Claim. Although aliens are entitled to the protection of the Equal Protection Clause, *Plyler v. Doe,* 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982), and 42 U.S.C. 1981, *Takahashi v. Fish & Game Commission,* 334 U.S. 410, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948), it has yet to be shown that PISD singled out Hispanics for disparate treatment. Certainly the policy on its face has a different and discriminatory impact on persons intending to become citizens as compared to the impact on persons who are already citizens. Defendant presented testimony that at least three Anglos have also been dismissed for falsifying information.[4] None of these persons were "intending citi-

---

**3.** Having determined that Plaintiffs are likely to succeed on their IRCA claims, the Court need not reach at this time whether provisions of IRCA also give rise to a claim under § 1983.

**4.** Here Plaintiff are quick to point out that the facts surrounding these discharges were more egregious than those which led to Plaintiffs' dismissals. One incident involved falsifying items on an expense account; another involved falsifying a sick leave form. These falsifications, unlike those of the Plaintiffs, resulted in monetary loss to PISD. The third incident involved lying about a criminal conviction. While that individual represented a potential safety risk to students, Plaintiffs present no such risk.

zens" within the meaning of the Act. The testimony from PISD as to how it learned that these individuals had invalid social security numbers lacks credibility. One PISD witness testified differently when questioned: one version when counsel for the Plaintiffs questioned her; one version when counsel for the Defendant questioned her; and a different version when the Court made an inquiry.

The Court finds the Plaintiffs' testimony regarding this issue to be credible. However, based on the evidence to date, the Court finds that there was no "witchhunt." The Court will accept PISD's position that it acted on its policy of terminating employees who falsify applications once that information is brought to their attention. Consequently, the Plaintiffs have failed to make the requisite showing that they are likely to succeed on this second cause of action.

There is a substantial likelihood, however, that Plaintiffs will prevail on their claim that actions taken by PISD in terminating Plaintiffs violate the anti-discrimination provision of IRCA Section 274B(a). Since this is a case of first impression, it is the Court's duty "to find that interpretation which can most fairly be said to be imbedded in the statute, in the sense of being most harmonious with its scheme and with the general purposes that Congress manifested." *C.I.R. v. Engle*, 464 U.S. 206, 217, 104 S.Ct. 597, 604, 78 L.Ed.2d 420 (1984) *quoting NLRB v. Lion Oil Co.*, 352 U.S. 282, 297, 77 S.Ct. 330, 338, 1 L.Ed.2d 331 (1957) (Frankfurter, J., concurring in part and dissenting in part).

■ The relevant portion of Section 274B(a) states:

It is an unfair immigration-related employment practice for a person or other entity to discriminate against any individual (other than an unauthorized alien) with respect to the hiring, or recruitment or referral for a fee, of the individual for employment or the discharging of the individual from employment—

(A) because of such individual's national origin, or

(B) in the case of a citizen or intending citizen ... because of such individual's citizenship status.[5]

When applied to those who are qualified for legalization, and who intend to become citizens, a policy of terminating undocumented aliens for no other reason than that they have given employers a false social security number constitutes an unfair immigration-related employment practice under § 274B(a) of the Act. Only because of Plaintiffs' citizenship status have they been unable to secure valid social security numbers.

Further, Defendant's stated practice clearly contravenes the intent of Congress in enacting this law. In reporting the bill favorably to Congress, the House Judiciary Committee said of the anti-discrimination provision:

The Committee does not believe barriers should be placed in the path of permanent residents and other aliens who are authorized to work and who are seeking employment, particularly when such aliens have evidenced an intent to become U.S. citizens. It makes no sense to admit immigrants and refugees to this country, require them to work and then allow employers to refuse to hire them because of their immigration (non-citizenship) status. Since Title VII does not provide any protection against employment discrimination based on alienage or non-citizen status, the Committee is of the view that the instant legislation must do so.

H.R.Conf. Report No. 99–682(I), at 70, U.S. Code Cong. & Admin. News 1986, p. 5674. Similarly, the Act would be manifestly unjust if it encouraged qualified aliens to come forward and reveal their undoc-

---

**5.** Section 274B creates an administrative structure for processing allegations of unfair immigration-related employment practices. That structure is not yet operative. Section 274B(b)(1) provides that such allegations should be filed with the Special Counsel created under the Act. It is the Special Counsel's duty to investigate possible violations and, if necessary, file a complaint before an administrative law judge. Section 274B(g). Final orders are then appealable to the appropriate United States Court of Appeals. Section 274B(i).

umented status only to have that very information serve as grounds for termination by employers. Under IRCA undocumented workers are given an opportunity to come forward, reveal their status, and apply for temporary residency, permanent residency and ultimately citizenship. The proposed application for legalization requires that candidates list *inter alia* their aliases, social security numbers used and employers. (Plaintiffs' Exhibit 1, questions number 4, 19 and 36 respectively). It seems only logical that the Immigration and Naturalization Service will seek to verify this information with the employers of undocumented workers. Such verification will inform employers of falsifications that these workers have made, and, in the case of PISD, the result will be that the workers will be automatically terminated. In short, the application for legalization will lead to a revelation of falsifications made by undocumented aliens. Such revelations will in many cases lead to terminations. Clearly, Congress did not intend to force qualified aliens to make the choice between exercising this right and risking termination of their employment. This Hobson's choice, however, is precisely the peril that Defendant and others with similar policies would have the intended beneficiaries of this new law face.

Though not before the Court, it is undoubtedly true that most employers have a policy of terminating employees who falsify their applications. Under ordinary circumstances, such a policy is justifiable and valid. It is an extraordinary circumstance, however, to have so many undocumented aliens working in the United States under

false names and with invalid social security numbers. In the coming months and years, the administrative process established under Section 274B of the Act will have to reconcile many current employment practices with the new rights established under IRCA.[6]

█ The second criterion in reviewing the request for preliminary injunction is the substantial likelihood of irreparable injury to Plaintiffs. The Fifth Circuit has stated: "When an injunction is explicitly authorized by statute, proper discretion usually requires its issuance if the prerequisites for the remedy have been demonstrated and the injunction would fulfill the legislative purpose." *Donovan v. Brown Equipment and Service Tools, Inc.*, 666 F.2d 148, 157 (5th Cir.1982). In other words, when a statute authorizes injunctive relief and the statutory conditions have been met, the requirement of irreparable injury will be presumed. *See United States v. Hayes International Corporation*, 415 F.2d 1038, 1045 (5th Cir.1969).

█ IRCA explicitly authorizes the Attorney General to seek injunctions against employers who engage in a pattern or practice of hiring aliens who are ineligible for legalization under the Act. Section 274A(f)(2). Similarly, an administrative law judge is empowered to issue cease and desist orders should he or she determine that an employer has engaged in an unfair immigration-related employment practice. Section 274B(g)(2)(A). The Court notes that irreparable injury is presumed where an employee, having exhausted all available administrative remedies, seeks a preliminary injunction in an employment dis-

---

6. Although each complaint will be addressed individually, it seems likely that the administrative courts will rely on the present extensive body of discrimination law, and in particular employment discrimination law, when examining allegations of unfair immigration-related employment practices under Section 274B. Under Title VII, facially neutral employment practices, which have a disparate impact on members of protected classes, have been invalidated in the absence of a showing that there is a business necessity for the practice and that less drastic alternatives to the practice are not feasible. *See Connecticut v. Teal*, 457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982); *Albemarle*

*Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Griggs v. Duke Power*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

A policy designed to promote accurate employment data could likely be justified as a business necessity. In the present case, it also seems likely that measures less drastic than automatically terminating any worker protected by the Act who falsified information could have been found. If nothing else, Defendant could have allowed the Plaintiffs a few additional weeks to apply for proper work authorization under the Act.

crimination action under Title VII. *Middle-ton-Keirn v. Stone,* 655 F.2d 609, 611 (5th Cir.1981). Exhaustion of administrative remedies is not a viable course of action for Plaintiffs since the administrative procedures established under the Act are not yet in place.

The Plaintiffs have demonstrated that they would likely suffer irreparable injury in the absence of an injunction. Leonel Castillo, a former Commissioner of the Immigration and Naturalization Service, testified that it has long been the policy of the United States to reject as candidates for citizenship aliens who are likely to become a public charge. That policy is modified by, but continues under Section 245A(d)(2)(B)(iii). He also testified that the more income that an applicant for legalization brings in support of his or her petition, the more favorably that petition will be viewed.

Defendant contends that in order to prevail under this prong of our analysis, Plaintiffs must affirmatively prove that the actions of the school district will render them public charges under the Act. It would be ludicrous to require that Plaintiffs show that they applied for legalization and were in fact rejected as potential public charges because of Defendant's actions before irreparable harm could be demonstrated. The procedures for evaluating applications have not been developed and the application process does not commence until May 5, 1987. Consequently, this would be an impossible burden for Plaintiffs to meet. The Court concludes that the proper burden is that Plaintiffs must show that actions of the Defendant will significantly increase the likelihood that they will be deemed potential public charges. Plaintiffs have met this burden. Discharging the Plaintiffs reduces, perhaps even eliminates, their income and increases the likelihood that they would be rejected for legalization as potential public charges.

In balancing the relative harm to the parties under the third prong of the criteria, the Court finds that the threatened injury to the Plaintiffs outweighs the potential harm to Defendant. In this regard, Defendant asserts that it has a significant interest in upholding the integrity of its employment practices and that the use of invalid social security numbers disrupts the clerical operation of the school district and can lead to inaccuracies in personnel-related reports.

Although these are valid issues, the evidence adduced at trial reduces the gravity of these concerns. PISD has a policy of punishing employees who falsify employment applications, but it also has a policy that it will verify the information on such applications within the thirty-day probationary period. Defendant jeopardized the integrity of its own employment practices when it failed to verify Plaintiffs' applications in conformity with its stated policy. Furthermore, there was no evidence that the specific social security numbers given by Plaintiffs had caused disruption of clerical operations. Moreover, an assistant superintendent in charge of finance was unable to quantify the time school district personnel spent correcting inaccuracies in reports stemming from employees' use of false social security numbers.

In any event, these problems are temporary. Those aliens wishing to apply for legalization under IRCA must do so within one year of the date to be determined by the Attorney General under Section 245A(a)(1)(A). The designated date must be within 180 days of the law's enactment. Moreover, after a specified period of lawful permanent residency a legal alien must apply for naturalization within six months of becoming eligible and must, except in limited circumstances, be naturalized as a citizen within two years of making the application (excluding the time required to process the application). Section 274B(a)(3). Consequently, within a not unreasonable period of time, the legalization process will result in qualified aliens receiving valid social security numbers and becoming American citizens.

By contrast, the potential harm resulting from Defendant's actions could have lasting implications for the Plaintiffs. Indeed, the harm that PISD would suffer by waiting a few weeks until the machinery of the

legalization process is in place is small compared to the damage Plaintiffs would suffer by being denied legalization.

Finally, the Court finds that the granting of the injunction will not disserve the public interest, but rather will advance it. The school district has urged that it has a legitimate and important role in inculcating and upholding the virtue of honesty to its students. *See Bethel School District No. 403 v. Fraser,* —— U.S. ——, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986). The citizens, however, through their elected officials in Congress, have determined that the presence of large numbers of illegal aliens can no longer be ignored. Congress has determined that it can neither turn back the hands of time nor ignore reality. The purpose of the Act is to extend a welcome hand to those undocumented aliens who have lived in the United States for the requisite number of years and can meet the other requirements for citizenship. At the same time, the law seeks to discourage unregulated immigration by providing for future sanctions against employers who hire unauthorized aliens. Section 274A.

If Defendant's employment practice is allowed to stand, Plaintiffs and many others similarly situated would be placed in the unfortunate and untenable position of deciding between prospective citizenship and present employment. In order to qualify for legalization, they must come forward and reveal their past misdeeds, misstatements, and falsifications. Once made, these revelations will automatically result in the termination of any qualified alien now working with PISD. Other similarly situated individuals run the risk of being fired from their jobs, either for falsifying their employment applications or for having invalid social security numbers.

If the Court gives way to the Defendant's argument that the value of enforcing its employment policy should expressly reign supreme over Congressional legislation designed to cure a problem which affects all persons living in the United States, whether citizens or not, then the Act would be rendered ineffectual. Also many employers—some unabashedly, others with a wink and a not—have in the past knowingly and unlawfully hired undocumented aliens who were in this country. It would reward hypocrisy to allow such employers now to terminate qualified undocumented aliens for the sole reason they have made false statements by presenting invalid social security cards.

The Immigration Reform and Control Act of 1986 bestows certain rights, including the right to apply for citizenship, upon a class of aliens who are in this country illegally and without proper documentation. Plaintiffs belong to this class. Current citizens are not similarly situated to this class, are not protected by IRCA, and therefore cannot point to this Act as justification for any falsifications they may have made. Defendant's actions have the effect of jeopardizing Plaintiffs' rights under IRCA before they have had an opportunity to exercise those rights. If the Act is to be given force and effect, obvious impediments to securing its benefits should not be sanctioned.

Accordingly, it is ORDERED, ADJUDGED, and DECREED that Plaintiffs' Motion for a Preliminary Injunction be and hereby is GRANTED.

It is further ORDERED that:

1. Defendant shall immediately reinstate Plaintiffs Maria Olympia Hernandez, Reina Raquel Guillen, Blanca Lopez, and Maria Garza to the positions they occupied in Defendant's employ immediately prior to their dismissal. Plaintiffs shall receive at least the same wages, benefits and other terms and conditions of employment that they received prior to their dismissals.

2. Upon issuance of a permanent injunction, Defendant shall pay Plaintiffs back wages from the date of their individual terminations.

3. Defendant is hereby enjoined from dismissing any employee who is an undocumented alien qualified for legalization under the Immigration Reform and Control Act of 1986 because he or she has provided a false social security number.

4. A hearing will be held to determine Plaintiffs' entitlement to reasonable attorney's fees and the amount thereof.

5. Plaintiffs need post no bond.