249 P.3d 680 (2011)
STATE of Washington, Respondent,
v.
Corey (NMI) CHRISTMAN, Appellant.
No. 28609-6-III.
Court of Appeals of Washington, Division 3.
March 17, 2011.
*682 Susan Marie Gasch, Gasch Law Office, Spokane, WA, for Appellant.
Carole Louise Highland, Attorney at Law, D. Angus Lee, Grant County Prosecuting Attorney, Ephrata, WA, for Respondent.
SIDDOWAY, J.
¶ 1 Delivering a controlled substance that is used by the person to whom it was delivered, resulting in the death of the user, is punishable as controlled substances homicide. Corey Christman appeals his conviction for the crime, contending (1) that in order to prove the "results in death" element, the State was required to prove that the user's death was proximately caused by the drug he delivered and, given evidence that other substances contributed to the death in this case, the evidence was insufficient and (2) alternatively, that the statute establishing the crime is unconstitutionally vague in failing to clearly identify how a defendant's delivery of drugs must relate to the cause of death. We hold that proximate cause is a required element of controlled substances homicide, that the statute establishing the crime is not unconstitutionally vague in that respect, and that the evidence was sufficient to support the conviction.

FACTS AND PROCEDURAL BACKGROUND
¶ 2 On an evening in September 2008, a group of young people gathered at the sand dunes near Moses Lake, Washington, to party. They built a bonfire, ate, and drank beer and wine coolers. Some smoked marijuana and took ecstasy (methylenedioxymeth-amphetamine). Among those in attendance were Corey Christman and Ryan Mulder.
¶ 3 Mr. Christman brought nine and one-half methadone pills to the party, intending to sell them. Instead, he gave two of the pills to Mr. Mulder. Mr. Mulder later told Mr. Christman that he was not feeling any effect from the pills and asked for more, and Mr. Christman gave him another three. Still later, Mr. Mulder asked for more and was directed by Mr. Christman to the pocket of his shirt, which was by the fire. The next morning, Mr. Christman discovered that the remaining four and one-half pills that were in his shirt pocket were gone.
¶ 4 The partiers left the sand dunes after about an hour and one-half. Several, including Mr. Mulder, drove to the home of Justin Sibley. Those who moved on to the Sibley *683 home characterized Mr. Mulder as appearing extremely intoxicated. After lingering for a while at the Sibley home, several people walked Mr. Mulder to a nearby house where he planned to spend the night in the garage, something he had done before. Mr. Mulder said he was thirsty and would like something to eat, and before leaving Mr. Mulder to sleep, the residents of the home provided him with water and food.
¶ 5 The next morning, residents who went to wake Mr. Mulder found him barely breathing. After unsuccessfully trying to revive him, someone called 911. Mr. Mulder was taken to Samaritan Hospital and was then flown to Deaconess Medical Center in Spokane, where he died two days later. The only items of evidentiary value later located in the garage were items of clothing; no evidence of drugs or alcohol was discovered. By all accounts, Mr. Mulder did not consume any drugs or alcohol after leaving the sand dunes.
¶ 6 County medical examiners determined that Mr. Mulder had not died of natural causes and had toxic levels of methadone in his body. Mr. Christman was thereafter charged with controlled substances homicide.
¶ 7 At trial, Dr. John Howard, a forensic pathologist and one of the two medical examiners for Spokane County, testified that the cause of Mr. Mulder's death was hypoxic encephalopathy due to the use of methadone, methamphetamine, and alcohol and that aspiration pneumonitis contributed to his death. He relied on clinical evidence and laboratory test results from the hospital medical records, as well as a postmortem analysis of the earliest available hospital blood sample, which he requested be prepared by the state toxicology laboratory. Some of the screening tests performed at the hospitals over the several days of Mr. Mulder's care indicated the presence of methadone metabolites, alcohol, and methamphetamine but without quantifying the amounts present; one lab screen also indicated the presence of cannabinoids, or THC (tetrahydrocannabinol). The postmortem analysis prepared by the state toxicology lab measured the amount of methadone in Mr. Mulder's body as .23 milligrams per liter but did not reveal measureable evidence of alcohol or amphetamines, even though the toxicologist testified at the time of trial that he had run assays for those substances and the testing performed at the toxicology lab is more sensitive than a typical hospital assay.
¶ 8 On direct examination, Dr. Howard testified that ingesting nine and one-half pills of methadone was consistent with a blood methadone level of .23 milligrams per liter. He testified that the alcohol and methamphetamine present could have contributed to the toxic effects on the brain but that he could not say "percentagewise" what role, because their quantity was not measured. Report of Proceedings (RP) at 269.
¶ 9 When Dr. Howard was asked for his opinion as to methadone's contribution to the medical cause of death, defense counsel objected on foundation grounds, arguing that the doctor had no basis on which to form an opinion without knowing the amount of alcohol and methamphetamine in Mr. Mulder's system, which defense counsel suggested had metabolized prior to the postmortem testing. RP at 270. The objection was overruled, and Dr. Howard testified that .23 milligrams of methadone per liter had been shown to be lethal in other cases. RP at 284. When asked whether methadone caused the death of Mr. Mulder within reasonable medical certainty, Dr. Howard responded "Yes." RP at 273.
¶ 10 On cross-examination, Dr. Howard testified that both methamphetamine and alcohol were also causes of death. RP at 281-82. On redirect, the State questioned him further about methadone being an additional cause, and Dr. Howard testified:
My opinion is that all three combined to cause death, and that each one, each of the two drugs and the alcohol played a role. So each of thethe fact that each of them were detected describe it as each of them hastened his death. So the alcohol hastened his death, the methamphetamine hastened his death, and the Methadone hastened his death. So each of them is a cause of death.
RP at 284.
¶ 11 The medical testimony only partially bore out defense counsel's suggestion that *684 alcohol and methamphetamine could not be measured by the state toxicology lab because they had metabolized by the time of the postmortem analysis. Dr. Howard agreed that, while alive, Mr. Mulder would have more rapidly metabolized alcohol and methamphetamine than methadone, which could be one factor explaining why alcohol and methamphetamine were detected in some blood samples taken at the hospitals but did not exist in measureable amounts in the sample tested by the state toxicology lab.[1] But the state toxicologist testified that because the blood sample tested at the state toxicology lab was treated with an enzyme poison and anticoagulant at the time it was drawn, it would not have been compromised in the time elapsing before its postmortem analysis. RP at 302-03.
¶ 12 The instructions provided to the jury stated that among the elements the State was required to prove beyond a reasonable doubt in order to convict were:
(1) That on or about September 7, 2008, the defendant unlawfully delivered methadone, a controlled substance, to Ryan Mulder;
....
(3) That the defendant knew that the substance delivered was a controlled substance;
....
(5) That use of the controlled substance delivered by the defendant resulted in the death of Ryan Mulder.
Clerk's Papers at 32 (Instruction 12). The term "resulted in" was not defined for the jury, nor was a proximate cause definition instruction requested or given.
¶ 13 The jury found Mr. Christman guilty of controlled substances homicide and the superior court imposed a standard range sentence of 61 months. Mr. Christman appeals, contending first, that in light of the medical examiner's inability to isolate methadone as the cause of death, insufficient evidence supports his conviction; and second, that the controlled substances homicide statute is unconstitutionally vague as applied to him.

ANALYSIS
¶ 14 Mr. Christman's appeal proceeds from the premises (1) that the controlled substances homicide statute, RCW 69.50.415, requires that the State prove that a victim's death was proximately caused by a controlled substance delivered by the defendant and (2) that the State did not prove proximate cause in this case. If we do not reverse on the basis that the statute requires proof of proximate cause, he asks that we reverse by applying the rule of lenity or by finding the statute unconstitutional as applied.
¶ 15 RCW 69.50.415(1) provides:
A person who unlawfully delivers a controlled substance in violation of RCW 69.50.401(2)(a), (b), or (c) which controlled substance is subsequently used by the person to whom it was delivered, resulting in the death of the user, is guilty of controlled substances homicide.
Mr. Christman points out that no less an authority than the authors of the Washington Pattern Jury Instructions view the "results from" language in the statute as unclear as to the quality of causation required. Br. of Appellant at 6-7. The comment to pattern instruction 29.02 notes that "[i]t is not clear whether the Legislature intended that the death of the user must be proximately caused by the use of the controlled substance or that use of the controlled substance merely `result in the death of the user.'" 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 29.02, cmt. (3d ed. 2008). The comment further states that if the standard is determined to be proximate cause, the words "proximately caused" should be substituted for "resulted in" and the jury should be instructed as to the definition of proximate cause. Id.

*685 I
¶ 16 Mr. Christman's challenge hinges on a preliminary question of statutory interpretation: whether the element of controlled substances homicide that use of the delivered substance "results in" the user's death requires proximate cause. The appropriate standard of review is therefore de novo. State v. Armendariz, 160 Wash.2d 106, 110, 156 P.3d 201 (2007).
¶ 17 In construing a statute, the goal is to discern and implement the intent of the legislature. State v. Neher, 112 Wash.2d 347, 350, 771 P.2d 330 (1989). If the language is plain and unambiguous, the meaning is derived from the wording of the statute itself. Id. The "plain meaning" of a statute is to be discerned from the ordinary meaning of the language at issue, the context of the statute in which the provision is found, related provisions, and the statutory scheme as a whole. State v. Engel, 166 Wash.2d 572, 578, 210 P.3d 1007 (2009).
¶ 18 The term "resulting in" is not defined by statute or Washington case law. Common law definitions of the intransitive verb "result" include "to proceed, spring, or arise as a consequence, effect, or conclusion." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1937 (3d ed. 1993). Mr. Christman argues that the undefined term fails to make clear whether delivery of a controlled substance is punishable as controlled substances homicide if the delivered drug is not a cause of death but is present in the user's system, if the delivered drug is a contributing cause of death but not the sole cause, or only if the delivered drug is the sole cause of death. Br. of Appellant at 13.
¶ 19 The controlled substances homicide statute is included in chapter 69.50 RCW, which was originally adopted in 1971 as the Uniform Controlled Substances Act. LAWS OF 1971, 1st Ex. Sess., ch. 308. The uniform act is based on the federal Controlled Substances Act, Pub.L. No. 91-513, 21 U.S.C. §§ 801-904 (1970). See UNIF. CONTROLLED SUBSTANCES ACT prefatory note, 9 pt. V U.L.A. 853, 854 (2007) (Uniform Controlled Substances Act's purpose is to achieve uniformity between the laws of the several states and those of the federal government and was designed to complement the federal legislation). Among the provisions of the uniform act is one directing that it be applied and construed not only to effectuate its general purpose, but also to make uniform the law with respect to its subject matter among the states enacting it. RCW 69.50.603.
¶ 20 But RCW 69.50.415, added in 1987, is not a part of the uniform act or any proposed modification to the uniform act, and there is no legislative history that identifies its source or explains its intended scope. See LAWS OF 1987, ch. 458, § 2; FINAL B. REP. on H.B. 1228, 50th Leg., Reg. Sess. (Wash. 1987); H.B. REP. on H.B. 1228, 50th Leg., Reg. Sess. (Wash. 1987); S.B. REP. on H.B. 1228, 50th Leg., Reg. Sess. (Wash. 1987). Its language is strikingly similar to language included in federal legislation adopted a year earlier, however: the federal Narcotics Penalties and Enforcement Act of 1986, Pub.L. No. 99-570, § 1002, which amended Section 401(b)(1) of the Controlled Substances Act (21 U.S.C. § 841(b)(1)) to include sentencing enhancements for distribution of a controlled substance "if death or serious bodily injury results from the use of such substance." Federal courts construing the sentencing enhancement provisions have concluded that "results in" has a passive connotation, requiring that the government prove only cause in fact, not proximate cause, meaning (given the federal common law concept of proximate cause) that the risk of serious bodily harm or death need not be foreseeable. United States v. Hatfield, 591 F.3d 945, 949 (7th Cir.2010) (concluding that a jury instruction limited to the statutory language would have been clearer than the flawed instruction elaborating on what "results from" means); and see United States v. Houston, 406 F.3d 1121, 1124-25 (9th Cir.), cert. denied, 546 U.S. 914, 126 S.Ct. 282, 163 L.Ed.2d 249 (2005); United States v. Soler, 275 F.3d 146, 152-53 (1st Cir.), cert. denied, 535 U.S. 1071, 122 S.Ct. 1948, 152 L.Ed.2d 851 (2002). These cases are unhelpful to our analysis, however, because they involve the distinguishable context of sentencing enhancements. By contrast, where a required element of a federal crime is a certain result, it is a basic tenet of *686 federal criminal law that the government must prove that the defendant's conduct was the legal or proximate cause of the resulting injury. United States v. Pineda-Doval, 614 F.3d 1019, 1026-27 (quoting United States v. Spinney, 795 F.2d 1410, 1415 (9th Cir.1986); United States v. Main, 113 F.3d 1046, 1050 (9th Cir.1997)), 1028 (9th Cir. 2010) (observing that "[s]entencing factors applicable to drug crimes seem to be the exception to the rule that the Government prove probable cause when the charging statute calls for a certain result"). The federal cases are also distinguishable in their application of the federal common law concept of probable cause, which, unlike Washington's concept, generally focuses on foreseeability. See Pineda-Doval, 614 F.3d at 1028; cf. State v. Leech, 114 Wash.2d 700, 711, 790 P.2d 160 (1990) (foreseeability is not an element of proximate cause under Washington law).
¶ 21 We therefore look to basic tenets of our own criminal law, and to other provisions of the Washington criminal code. The legislature provided in 1975 that "[t]he provisions of the common law relating to the commission of crime and the punishment thereof, insofar as not inconsistent with the constitution and statutes of this state, shall supplement all penal statutes of this state." LAWS OF 1975, 1st Ex. Sess., ch. 260, § 9A.04.060, codified at RCW 9A.04.060. In so providing, the legislature both ratified the judicial practice of supplying common law definitions to statutes and affirmatively defined the elements of criminal statutes as containing common law definitions. State v. Chavez, 134 Wash.App. 657, 668, 142 P.3d 1110 (2006), aff'd, 163 Wash.2d 262, 180 P.3d 1250 (2008). Accord State v. David, 134 Wash.App. 470, 481, 141 P.3d 646 (2006) ("the judiciary would be acting contrary to the legislature's legitimate, express expectations, as well as failing to fulfill judicial duties, if the courts did not employ long-standing common law definitions to fill in legislative blanks in statutory crimes"), review denied, 160 Wash.2d 1012, 161 P.3d 1026 (2007).
¶ 22 The criminal law, both common law and statutory, has long imposed criminal liability for conduct that causes a particular result. When crimes are defined to require both conduct and a specified result of that conduct, the defendant's conduct generally must be the "legal" or "proximate" cause of the result. 1 WAYNE R. LaFAVE, SUBSTANTIVE CRIMINAL LAW § 6.4, at 464 (2d ed. 2003). As summarized by LaFave:
For one thing, it must be determined that the defendant's conduct was the cause in fact of the result, which usually (but not always) means that but for the conduct the result would not have occurred. In addition, even when cause in fact is established, it must be determined that any variation between the result intended (with intent crimes) or hazarded (with reckless or negligent crimes) and the result actually achieved is not so extraordinary that it would be unfair to hold the defendant responsible for the actual result.
Id. Accord State v. Perez-Cervantes, 141 Wash.2d 468, 484, 6 P.3d 1160 (2000) (Johnson, J., dissenting) ("In crimes, such as murder, which are defined to require specific conduct resulting in a specific effect, the State must prove the defendant's criminal act was both the `cause in fact' and the `legal' cause of the result. State v. Rivas, 126 Wash.2d 443, 453, 896 P.2d 57 (1995); State v. Dennison, 115 Wash.2d 609, 624, 801 P.2d 193 (1990).").
¶ 23 Consistent with this general tenet, murder punishable under the Washington criminal code requires that a defendant's or felony participant's conduct "cause the death" of a person, RCW 9A.32.030(1)(a),.050(1)(a), an element that requires proof of proximate cause. See, e.g., State v. Little, 57 Wash.2d 516, 521, 358 P.2d 120 (1961) (causal connection between death and criminal conduct of the accused is one element of the corpus delecti). Homicide by abuse requires proof that a defendant's conduct "cause[ ] the death" of a person in a class protected by the statute, RCW 9A.32.055(1), and likewise requires proof of proximate cause. State v. Berube, 150 Wash.2d 498, 510, 79 P.3d 1144 (2003). Manslaughter includes conduct recklessly or negligently "caus[ing] the death" of a person, RCW 9A.32.060(1)(a), .070(1). It, too, requires proof of proximate cause. State v. Ramser, 17 Wash.2d 581, 586, 136 P.2d 1013 (1943).
*687 ¶ 24 There appears to be no legislative intent to differentiate conduct "causing death" from conduct "resulting in death." Statute of limitations provisions, for instance, provide no limitations period for arson, vehicular assault, or hit-and-run injury-accident if "a death results." RCW 9A.04.080(1)(a)(iii), (v), (vi). And cf. RCW 9A.40.100(a)(ii)(C) (trafficking constitutes trafficking in the first degree when, inter alia, it "[r]esult[s] in a death"); RCW 9A.36.120(1)(b)(ii) (using "cause" and "result" terminology interchangeably in defining category of first degree assault of a child).
¶ 25 Contrary to Mr. Christman's argument, we find no textual or contextual support for construing "results in" to mean that use of the controlled substance delivered by the defendant must be the sole cause of death. Not only does that construction lack textual or contextual support, but construing a statute to impose criminal culpability only where a defendant's conduct is the sole cause of serious bodily injury or death has been rejected as leading to strained, unlikely, or absurd consequences. Neher, 112 Wash.2d at 351, 771 P.2d 330 (legislature "surely did not intend" that defendant would be relieved of criminal culpability any time conduct of the victim or a third party contributed to injury, regardless of the degree of that conduct).
¶ 26 Taking into consideration these related criminal statutes and long-standing common law concepts of "cause" and "result," we construe RCW 69.50.415 to have unambiguously required that the State prove that the methadone provided to Mr. Mulder by Mr. Christman was a proximate cause, but not the sole cause, of Mr. Mulder's death. The rule of lenity therefore does not apply.

II
¶ 27 We next consider whether the evidence was sufficient to establish that Mr. Christman's delivery of methadone resulted in Mr. Mulder's death, analyzing causation in terms of proximate cause. In reviewing the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Joy, 121 Wash.2d 333, 338, 851 P.2d 654 (1993).
¶ 28 As earlier discussed, proximate cause has two components: cause in fact and legal causation. With respect to cause in fact, tort and criminal situations are exactly alike. State v. McDonald, 90 Wash. App. 604, 612, 953 P.2d 470 (1998), aff'd, 138 Wash.2d 680, 981 P.2d 443 (1999). There are several tests for factual causation, the most common of which is the "but for" test, although the "substantial factor" test applies in some circumstances. Id. One instance in which the substantial factor test applies is where multiple causes could have produced the identical harm, thus making it impossible to prove the "but for" test. The "substantial factor" test is generally applied in multiple causation cases. Id. at 613, 953 P.2d 470 (quoting Allison v. Housing Auth., 118 Wash.2d 79, 94, 821 P.2d 34 (1991)). Under the substantial factor test, all parties whose actions contributed to the outcome are held liable. Id.
¶ 29 The second componentthe fairness of holding a defendant responsibleis the province of legal causation, described in Hartley v. State, 103 Wash.2d 768, 779, 698 P.2d 77 (1985), a tort case, as follows:
Legal causation ... rests on policy considerations as to how far the consequences of defendant's acts should extend. It involves a determination of whether liability should attach as a matter of law given the existence of cause in fact. If the factual elements of the tort are proved, determination of legal liability will be dependent on "mixed considerations of logic, common sense, justice, policy, and precedent."
(Quoting King v. City of Seattle, 84 Wash.2d 239, 250, 525 P.2d 228 (1974), overruled on other grounds by City of Seattle v. Blume, 134 Wash.2d 243, 947 P.2d 223 (1997).) Washington Pattern Jury Instructions refer to proximate cause, in its factual context, as "a cause which in a direct sequence [unbroken by any new independent cause,] produces the [injury] [event] complained of and without which such [injury] [event] would not have happened." 6 WASHINGTON PRACTICE: *688 WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 15.01 (5th ed. 2005).[2]
¶ 30 Although a defendant's conduct is not a proximate cause if some other cause is a sole or superseding cause, it can be a proximate cause if another cause is merely a concurrent cause. The same harm can have more than one proximate cause. State v. Meekins, 125 Wash.App. 390, 398-99, 105 P.3d 420 (2005).
¶ 31 Dr. Howard's opinion was that all three substancesmethadone, alcohol, and methamphetaminecombined to cause death and that each one played a role. Only methadone was present in a quantifiable amount in the blood sample tested by the state toxicology lab, however, and the amount of methadone present was more than enough to cause toxicity and death. Dr. Howard testified that, with reasonable medical certainty, the methadone caused Mr. Mulder's death. A jury verdict will not fail on sufficiency of evidence grounds due to evidence suggesting a concurrent or intervening cause. See, e.g., Perez-Cervantes, 141 Wash.2d at 487, 6 P.3d 1160 (Johnson, J., dissenting); Leech, 114 Wash.2d at 705, 790 P.2d 160; State v. Karsunky, 197 Wash. 87, 99, 84 P.2d 390 (1938).
¶ 32 Viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

III
¶ 33 Finally, and alternatively, Mr. Christman argues that the legislature's failure to define "resulting in" renders the controlled substances homicide statute unconstitutionally vague, contrary to the Fourteenth Amendment. Other courts have rejected vagueness challenges to similar controlled substance crimes or sentencing enhancements. See United States v. Chevalier, 776 F.Supp. 853, 859 (D.Vt.1991) (rejecting vagueness challenge to 21 U.S.C. § 841(b)(1)(C) on facts of case); State v. Maldonado, 137 N.J. 536, 645 A.2d 1165, 1182 (1994) (rejecting vagueness challenge to drug death statute imposing liability if death results, subject to a statutory exception for remote or attenuated results). But we apply our own analysis to the statute before us and the facts of this case.
¶ 34 A defendant challenging a statute as unconstitutionally vague must show, beyond a reasonable doubt, that either (1) the statute does not define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is proscribed, or (2) does not provide ascertainable standards of guilt to protect against arbitrary enforcement. City of Spokane v. Douglass, 115 Wash.2d 171, 178, 795 P.2d 693 (1990). The void-for-vagueness doctrine protects against laws that trap the innocent by not providing fair warning or impermissibly delegate policy matters to police officers, judges, and juries for resolution on an ad hoc and subjective basis. Bullfrog Films, Inc. v. Wick, 847 F.2d 502, 512 (9th Cir.1988).
¶ 35 "The first step in any vagueness challenge `is to determine if the statute in question is to be examined as applied to the particular case or to be reviewed on its face.'" State v. Coria, 120 Wash.2d 156, 163, 839 P.2d 890 (1992) (quoting Douglass, 115 Wash.2d at 181-82, 795 P.2d 693). If the statute does not involve First Amendment rights, then the vagueness challenge is to be evaluated by examining the statute as applied under the particular facts of the case. Id. Since the controlled substances homicide statute does not implicate any First Amendment rights, we evaluate the application of the statute to the conduct of Mr. Christman proved to the satisfaction of the jury: that he had delivered nine and one-half methadone pills to Mr. Mulder, whose subsequent use of the pills resulted in death.
¶ 36 RCW 69.50.415 defines the crime of controlled substances homicide as requiring (1) "delivery," meaning "the actual or constructive *689 transfer from one person to another of a substance, whether or not there is an agency relationship," RCW 69.50.101(f); (2) of a "controlled substance," meaning "a drug, substance, or immediate precursor included in Schedules I through V as set forth in federal or state laws," RCW 69.50.101(d); (3) that the controlled substance be used by the person to whom it was delivered; and (4) that the use result in the death of the user.
¶ 37 Mr. Christman does not argue that there is anything vague about any element other than causation. Focusing on causation, he cannot tenably argue that RCW 69.50.415 is too indefinite for him to have avoided the proscribed conduct. There is no reasonable meaning of "result in death" under which Mr. Christmanwho made available a lethal dose, directly to the user, knowing that the user was seeking the drug for immediate consumptioncan claim to have been trapped without fair warning. Examining the statute with respect to the facts of this case, it is not unconstitutionally vague within the meaning of the first aspect of the vagueness doctrine.
¶ 38 So, too, with the second aspect of the doctrine. The evidence of the causal connection between Mr. Mulder's use of the methadone provided and his death was sufficient under the conceivably applicable standards of cause: cause-in-fact or proximate cause. The facts of this case do not present a risk of enforcement that was arbitrary, erratic, or discriminatory. See Douglass, 115 Wash.2d at 180, 795 P.2d 693. A statute "employ[ing] words with a well-settled common law meaning, generally will be sustained against a charge of vagueness." Anderson v. City of Issaquah, 70 Wash.App. 64, 75, 851 P.2d 744 (1993).
¶ 39 We affirm the judgment and sentence.
WE CONCUR: KULIK, C.J., and BROWN, J.
NOTES
[1] Dr. Howard testified that among the laboratory studies done were studies at both hospitals for treatment purposes, and later to confirm that Mr. Mulder could be an organ donor. RP at 264. Other than Dr. Howard's testimony that he requested that the earliest drawn sample available be analyzed, there was no evidence when the sample received by the state toxicology lab had been drawn. RP at 304.
[2] It is the aspect of legal causation by which the court weighs policy considerations in cases where a defendant's act is so removed and attenuated from the result that perhaps liability ought not attach. No such argument was made in this case. As a determination of what actually occurredthe only aspect of proximate cause at issue herecause in fact is generally left to the jury. Hartley, 103 Wash.2d at 778, 698 P.2d 77.